United States District Court
Southern District of Texas
**ENTERED**
July 28, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:15-CR-566-1 |
| | § | |
| LEE ROY VILLARREAL, | § | |
| | § | |
| *Defendant.* | § | |

## **MEMORANDUM OPINION**

Defendant Lee Roy Villarreal ("Defendant" or "Villarreal") was charged in a superseding indictment with three counts[1]: (1) conspiracy to possess with intent to distribute controlled substances (21 U.S.C. § 846), (2) conspiracy to kidnap (18 U.S.C. § 1201(c)), and (3) kidnapping (18 U.S.C. § 1201(a)(1)). (Doc. No. 266). The superseding indictment alleged that the drug conspiracy existed from April 1, 2011, to February 20, 2016; that the conspiracy to kidnap existed from May 1, 2011, to May 28, 2011; and that the kidnapping occurred on May 28, 2011. (*Id.* at 1–5). The case proceeded to trial earlier this year.

Victor Alfonso Romero ("Romero") had been listed as a possible witness for the Government because he had told government agents that Villarreal had been involved in the planning—and perhaps even the execution—of the kidnapping plot underlying Counts Two and Three of the superseding indictment. Ultimately, the Government decided not to call Romero. Thereafter, during the defense's case-in-chief, defense counsel informed the Court that, despite the fact that Romero had implicated Villarreal, they intended to call Romero as a witness. The defense

---

[1] Count Four of the superseding indictment—Using, Carrying and Brandishing a Firearm (18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(A)(iii))—was dismissed at the Government's request. (Doc. No. 293).

team indicated that they were convinced that Romero lied to the agents when he implicated Villarreal and that they hoped they could get him to admit on the witness stand that he lied.

Romero, through counsel, notified the Court that, if called to testify, he intended to invoke his Fifth Amendment privilege against self-incrimination. Villarreal then requested that the Court issue an order compelling Romero to testify despite the assertion of his Fifth Amendment privilege and granting him "defense witness immunity" for any self-incriminating testimony. The Government indicated its opposition to Defendant's request. The Court heard argument on the issue, and Defendant filed a trial brief further setting out his position (Doc. No. 385).

Subsequently, the Court announced from the bench that Defendant's motion to immunize Romero was denied. The Court stated that the reasons for the denial would be more fully explained in a subsequently issued memorandum opinion, which the Court hereby issues. This opinion memorializes, supplements, and explains the Court's ruling regarding the refusal to immunize Victor Romero.

## I. Background

As stated above, during Villarreal's case-in-chief, the defense sought to call Romero as a witness to elicit evidence "that he [Villarreal] was not present at the alleged kidnapping, and that his [Romero's] story changed to implicate Lee Roy Villarreal after he [Romero] was coerced and intimidated by government actors." (Doc. No. 385, at 3). After his arrest in Cause Number 6:18-CR-00067 in the Victoria Division of the Southern District of Texas, Romero was interviewed three times by government agents. The first two interviews were handled by agents or prosecutors involved in the Victoria case investigation, while the third interview was conducted by those involved in this case. Summaries of those three interviews are as follows.

First, on June 30, 2018, Romero was questioned by Homeland Security Investigations Special Agent Steven Greenwell ("Greenwell") about the alleged kidnapping. Romero was in custody at the time in the above-referenced drug-trafficking case.[2] Romero did not implicate Villarreal in the kidnapping. This interview was apparently recorded (Doc. No. 385, Ex. A), and there is a Report of Investigation (Doc. No. 385, Ex. B).[3] Neither the recording nor the report of investigation made reference to any photos being shown to Romero or to any questions asked of him regarding Villarreal. (Doc. No. 385, at 1). Thus, Romero neither inculpated nor exculpated Villarreal in this session.

Second, on August 28, 2018, Romero was questioned by Greenwell and Assistant United States Attorney Patty Booth ("Booth") in the presence of his then-defense attorney.[4] This questioning was also recorded (Doc. No. 385, Ex. C), but there was no written Report of Investigation that was provided to the Court. In Defendant's view of the recording, "Romero denies knowledge of Lee Roy Villarreal's involvement in the kidnapping several times over the 10 minute period that he is pressured to implicate" Villarreal. (Doc. No. 385, at 1).[5] Some of the alleged pressuring tactics employed by the agents included telling Romero "the FBI would really

---

[2] The charges in Romero's case related to his role in distributing marijuana with a criminal association known as the "Beltran drug trafficking organization." (Doc. No. 385. Ex. B, at 2–3).

[3] The exhibits to Defendant's trial brief were not filed on ECF. Defense counsel provided the undersigned's chambers with a thumb drive containing all the exhibits cited in this opinion, except for the recording of the June 2018 interview. The Court assumes that, consistent with defense counsel's representation, *see* (Doc. No. 385, at 1), the recording of the June 2018 interview made no reference to any photos being shown to Romero or any questions asked of him regarding Villarreal.

[4] At the August 2018 interview conducted by investigators on the Victoria case, Romero was represented by Rene C. Flores. At Villarreal's Houston trial, Romero was represented by Anthony Troiani, whom the Court appointed to represent Romero regarding the possible issues of self-incrimination arising from his taking the stand. (Doc. No. 383).

[5] The Court does not necessarily agree with the defense's characterization of the audio recording. Rather than affirmatively denying Villarreal's involvement, Romero, at most, equivocated—for example, when asked whether Villarreal was at the kidnapping, Romero responded, "I don't know—I need to think about it," (Doc. No. 385, Ex. C, at 44:20–44:28), and later explained, "there was a lot of guys there" (*id.* at 45:00–45:15).

rather have you as a witness than a defendant" (Doc. No. 385, Ex. C, at 36:50–37:03) and instructing him to "discuss with [your defense attorney] after this if you would like to sit down and talk to the FBI, before they approach you in an entirely different fashion" (*id.* at 45:57–46:08). Agents also told Romero that they "know" that Villarreal conducted a "training session" instructing co-conspirators on how to kidnap individuals. (Doc. No. 385, at 1). Reference was made to photographs of Villarreal that were shown to Romero at some point previously but which Romero could not recognize. (Doc. No. 385, Ex. C, at 44:00–44:20; 44:37–45:00). There is no description of this previous questioning or the photos he was shown at that time.

Finally, at the conclusion of the 10-minute discussion, Romero acquiesced that Villarreal "might have been" at the kidnapping. (Doc. No. 385, Ex. C, at 45:50–45:56). He was asked no further questions about the kidnapping at that point. In front of Romero, Romero's attorney asked if the government agents needed something "more incriminating" about Villarreal, to which Booth answered "yeah." (*Id.* at 1:05:30–1:06:01).

Third, on August 28, 2019, Romero was questioned by Greenwell and Federal Bureau of Investigations ("FBI") Special Agent Christopher Lee. This interview was not audio recorded. There was a written synopsis of the interview. (Doc. No. 385, Ex. D). In Defendant's view, this was "the first time" that Romero implicated Villarreal or indicated he could identify Villarreal at all, and Romero "gave facts about Lee Roy Villarreal eerily similar to those told to him by the agents in the August 2018 meeting." (Doc. No. 385, at 2). He also identified a picture of Villarreal. (*Id.*). It is unknown whether this was the same picture or a different picture than the one that he did not identify at some unknown prior time. (*Id.*).

Despite the fact that Romero's earlier statements did not exculpate Villarreal and his latest statement implicated Villarreal, at Villareal's trial, the defense sought to call Romero to the witness

stand, hoping to convince him to testify that he had lied to the agents regarding Villarreal's participation in the kidnapping, and to utilize him as a vehicle through which to play to the jury the audio recordings of the August 2018 interviewing techniques he underwent in order to bolster the defense's theory that government investigators had intimated witnesses into testifying against Villarreal.[6]

## II.     Analysis of Immunity Issue

Were Romero granted immunity and called to the witness stand, his testimony could have taken one of two paths. First, Romero could have testified (untruthfully, according to defense counsel) consistent with his last statement that Villarreal was involved in the kidnapping.[7] Defense counsel stated that the defense would have then sought to play the audio recording of the August 2018 interview to impeach Romero by what they questionably characterize as inconsistent prior statements. *See* FED. R. EVID. 607 ("Any party, including the party that called the witness, may attack the witness's credibility.").

Second, Romero could have testified that he had no knowledge of any involvement by Villarreal in the alleged kidnapping. This testimony, while helpful to the defense, would not necessarily exculpate Villarreal, but it would serve to incriminate Romero by exposing him to liability for lying to the government agents at the August 2019 interview, in which Romero told agents that Villarreal was indeed involved.

---

[6] In his trial brief, Villarreal contended that the audio recording would not violate the rule against hearsay, because "it is not being offered for the truth of the matter asserted, but rather for the effect on the listener (Mr. Romero)." (Doc. No. 385, at 3). However, defense counsel never addressed the relevancy (or lack thereof) of the testimony concerning techniques used by government agents unrelated to this case in August 2018 during an interview with a witness the Government did not call. There was no indication that these agents were involved or these techniques were used with any other witness. Thus, even if the Court had granted immunity, it is doubtful that the evidence would have been admissible to attack other witnesses' testimony.

[7] Had the Court compelled Romero to testify and his testimony taken this path, defense counsel would have risked running afoul of the rule of candor toward the tribunal. *See* TEX. DISCIPLINARY R. PRO. CONDUCT 3.03(a)(5) ("A lawyer shall not knowingly . . . offer or use evidence that the lawyer knows to be false."); *see also id.* cmts. 5, 15.

5

Once it was clear that Romero would invoke the Fifth Amendment, the defense moved this Court to compel Romero's testimony in order to "enforce the right of the accused to present a defense." (Doc. No. 385, at 6); *see also* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."). Specifically, the defense asked this Court to make a "grant of use immunity" for Romero to guarantee that his testimony (or other information derived therefrom) would not be used against Romero in any future criminal prosecution. (*Id.*)

To evaluate the propriety of granting such immunity, the Court draws on the principles elucidated by Judge Lake in addressing the same issue:

> The immunity sought for defendants' proposed witnesses is "use immunity," which is "[i]mmunity from the use of the compelled testimony (or any information derived from that testimony) in a future prosecution against the witness." *Black's Law Dictionary*, 754 (7th ed. 1999). "Use immunity" is a statutory creation, and Congress has delegated the authority to grant "use immunity" solely to the executive branch of government. 18 U.S.C. §§ 6001–6004, esp. § 6002. *See United States v. Smith*, 436 F.2d 787 (5th Cir.), *cert. denied*, 91 S. Ct. 1680 (1971). In exercising this authority, the executive branch must balance "the public need for the particular testimony or documentary information in question against the social cost of granting immunity and thereby precluding the possibility of criminally prosecuting an individual who has violated the criminal law." *In re Daley*, 549 F.2d 469, 478–479 (7th Cir.), *cert. denied*, 98 S. Ct. 110 (1977). The exclusive nature of Congress's delegation and the fact that the balancing process is wholly within the expertise of the executive branch foreclose federal courts from taking more than a ministerial role in prosecutorial immunity decisions that are properly made under 18 U.S.C. § 6003. *Id.* at 479. *See also* [*United States v.*] *Thevis*, 665 F .2d [616,] 639–640 [(5th Cir.), *cert. denied*, 102 S. Ct. 2300 and 3489 (1982) and 103 S. Ct. 57 (1983)] ("the immunity decision requires a balancing of public interests which should be left to the executive branch").
>
> The Sixth Amendment right to compulsory process does not require a different result. The Compulsory Process Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." This clause ensures that a defendant has subpoena power to summon witnesses so that the jury may hear the defendant's version of the facts. *See Washington v. Texas*, 87 S. Ct. 1920, 1923 (1967). The Fifth Circuit has held that the right to compulsory process "does not suggest a right to supercede a witness' invocation of his own fifth amendment

privilege or the right to demand that the government shield a witness from the consequences of his own testimony." [*United States v.*] *Chagra*, 669 F.2d [241,] at 260 [(5th Cir. Unit B), *cert. denied*, 103 S. Ct. 102 (1982)]. *See also Washington*, 87 S. Ct. at 1925 n.21 (although the Sixth Amendment invalidated Texas statutes that prohibited persons charged or convicted as co-participants in the same crime from testifying for one another, the Court noted that "[n]othing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination").

*United States v. Skilling*, No. 4:04-cr-00025, 2006 WL 1737546, at *2 (S.D. Tex. June 23, 2006).

In light of these principles, the Fifth Circuit "has repeatedly held that 'district courts have no inherent power to grant immunity.'" *United States v. Hager*, 879 F.3d 550, 556 (5th Cir. 2018) (quoting *United States v. Brooks*, 681 F.3d 678, 711 (5th Cir. 2012)). "A district court may not grant immunity simply because a witness has essential exculpatory evidence unavailable from other sources." *Brooks*, 681 F.3d at 711 (quoting *United States v. Follin*, 979 F.2d 369, 374 (5th Cir. 1992)). "At most," the Fifth Circuit "has left open the possibility that immunity may be necessary to stem government abuse." *Id.* (citing *Thevis*, 665 F.2d at 641). However, "[t]he exercise of this authority requires 'extraordinary circumstances.'" *Hager*, 879 F.3d at 556 (quoting *Chagra*, 669 F.2d at 258).

In the instant case, Defendant failed to make a showing of "extraordinary circumstances." Rather, there were innumerable problems with compelling Romero to testify. First, if one assumes that Romero would have testified consistent with his prior statements, the testimony would have been inculpatory as to the Defendant, not exculpatory. The defense would have, in effect, put on a witness that would have helped convict Defendant.[8] This Court has found no case, nor was it presented with one, that supports granting a defendant's request to immunize a witness so that the witness will provide inculpatory evidence.

---

[8] This strategy seems questionable at best and, if permitted, would have certainly set up grounds for an appeal on the basis of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686–87 (1984).

7

The only possible basis for granting immunity was the defense's hope that, if immunized, the witness would backtrack on what he told government agents on August 28, 2019. If that hope came true, the expected testimony (according to the Defendant) would be that Romero lied earlier to the government agents and that, in reality, he has no knowledge of Villarreal's involvement in the kidnapping. While somewhat favorable, the fact that one witness, among many, could not identify Defendant as being involved is hardly noteworthy. Moreover, the fact that the witness lied to government agents, regardless of his motivation for doing so, is (besides possibly being a felony) not probative of any material fact in this case.

The Court suspects the defense's real motivation in calling Romero as a witness had less to do with Romero's actual testimony (regardless of what he said) and more to do with the defense's desire for the jury to listen to the recording of the August 2018 interview, which the defense described as "coercive." However, since Romero did not testify against Villarreal, any alleged misconduct toward Romero on the part of government agents was irrelevant. This is especially true because there was no evidence that the Government engaged in similar interrogation tactics against any actual witnesses. Defense counsel was free to inquire of the witnesses who actually testified for the Government as to whether they had been pressured or coerced into testifying against Villarreal, and the defense either failed to do so or failed to gain any favorable testimony. Evidence of allegedly abusive conduct, as to a putative witness the Government did not call, conducted by different agents in a different case in a different division of this Court is totally irrelevant, absent some evidence connecting it to the witnesses that did testify. No such evidence exists.

### III. The Jury Verdict Rendered This Issue Moot

Since Defendant failed to present any evidence from which the Court could conclude that if immunized, Romero would offer essential exculpatory testimony, the Court concluded at trial that even if it had authority to grant immunity (which is doubtful based upon Fifth Circuit precedent), it lacked authority to grant Defendant's request for immunity for Romero. The Court further notes that even if it was error for this Court to refuse to immunize Romero, any such error was harmless because Romero's purported testimony related solely to the kidnapping charges, and the jury found the Defendant not guilty on both of those counts. (Doc. No. 397, at 2–3). The jury's acquittal on kidnapping charges mooted the issue of witness immunity.

### IV. Conclusion

For the reasons above, the Court **DENIED** Defendant's motion to immunize Victor Romero. Defendant's sentencing remains set as previously ordered. (Doc. No. 398).

**SIGNED** at Houston, Texas, this 26 day of July, 2022.

Andrew S. Hanen
United States District Court